UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____
                                    )
JEFFREY STEIN, et al.,              )
                                    )
            Plaintiffs,             )
       v.                           )   Civil Action No. 11-1400 (RBW)
                                    )
BANK OF AMERICA CORPORATION, et al., )
                                    )
            Defendants.             )
_____)

## MEMORANDUM OPINION

Jeffrey Stein and Rabindranauth Ramson, in their individual capacities and on behalf of all others similarly situated, seek injunctive and monetary relief for alleged violations of the Right to Financial Privacy Act (the "RFPA"), 12 U.S.C §3401 (2006), by Bank of America. Second Amended Complaint ("2d Am. Compl.") ¶¶ 118-22.  Currently before the Court is the defendants' motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(1) and 12(b)(6) for lack of subject matter jurisdiction and for failure to state a claim upon which relief can be granted.  See Defendants' Motion to Dismiss the Second Amended Complaint ("Defs.' Mot."). For the reasons that follow, the Court concludes that it must grant the motion and dismiss this case for lack of subject matter jurisdiction.[1]

---

[1] In addition to the documents already referenced, in resolving the motion the Court considered the following filings: (1) the Memorandum of Points and Authorities in Support of Defendants' Motion to Dismiss the Second Amended Complaint ("Defs.' Mem."); (2) the Plaintiffs' Opposition to Defendants' Motion to Dismiss ("Pls.' Opp'n"); (3) the Reply Memorandum of Points and Authorities in Support of Defendants' Motion to Dismiss the Second Amended Complaint ("Defs.' Reply"); and (4) the Defendants' Notice of Supplemental Authority.

1

## I.  BACKGROUND

The following facts are taken from the plaintiffs' Second Amended Complaint.  Bank of America is a national banking association headquartered in Charlotte, North Carolina.  2d Am. Compl. ¶ 6.  According to the plaintiffs, Bank of America established "a network of customer service call/data centers in the United States," which were "designed to provide Bank of America's customers with access to Bank of America personnel so such customers could fully utilize the financial services provided by Bank of America."  Id. ¶ 47.  In order to access these financial services, Bank of America customers were "directed to dial ten-digit, U.S.-exchange, 'domestic,' often-times toll-free telephone numbers," where Bank of America personnel had "access to the call customer's records."  Id. ¶¶ 47-48.

As a result of "[a]dvances in communications technology," Bank of America "expand[ed] . . . [their] information network of U.S.-based call/data centers to an information network of <u>foreign-based</u> call/data centers located overseas," mainly staffed by foreign nationals.  Id. ¶¶ 49-50 (emphasis added).  As with U.S.-based call/data centers, foreign-based call/data centers were also provided with access to a customer's records.  See id.  According to the plaintiffs, however, because Bank of America has "established a seamless customer experience such that [customers] who communicate with Bank of America by dialing U.S. telephone numbers are not affirmatively notified that their financial records have been transferred to foreign nationals residing overseas."  Id. ¶ 50.  Bank of America "does not routinely direct [customers] to dial '011' to reach the international phone exchange, or dial the country, or city codes of any foreign telephone in order to reach its bank personnel."  Id. ¶ 51.  As such, customers have not "purposefully availed themselves of non-U.S. communications or services provided by foreign nationals who reside overseas."  Id. ¶ 52,

According to the plaintiffs, because the Constitution and other United States laws do not extend to foreign nationals, when Bank of America provides foreign nationals in one of Bank of America's foreign-based call/data centers with a call customer's financial records, "United States Government authorities may access such financial records without [any legal impediment.]" Id. ¶ 76.  And again, according to the plaintiffs, the pervasive, foreign intelligence gathering activities conducted by the National Security Agency ("NSA") demonstrates the likelihood that the NSA has exploited, presently exploits or will exploit this absence of impediment.  See id. ¶¶ 57-82.

On August 3, 2011, the plaintiffs filed their initial complaint with this Court and asserted, on behalf of three named plaintiffs and a putative nationwide class, two claims under the RFPA, seven claims under the District of Columbia Consumer Protection Procedures Act ("CPPA"), and claims for negligence, bailment and unjust enrichment.  On October 6, 2011, one of the named plaintiffs, Priscilla Fuller, voluntarily dismissed her own cause of action.  On October 11, 2011, the remaining plaintiffs amended their complaint and abandoned their CPAA claims.  The defendants moved to dismiss the plaintiffs' First Amended Complaint for lack of subject matter jurisdiction and failure to state a claim and the plaintiffs sought and received consent to amend for a second time.  On November 22, 2011, the plaintiffs filed their Second Amended Complaint and on December 23, 2011, the defendants again moved to dismiss for lack of subject matter jurisdiction and failure to state a claim.

The plaintiffs assert that the defendants have violated the RFPA because by "routing financial records to foreign nationals overseas . . . Bank of America provides the U.S. [with] access to such financial records" in direct contravention of 12 U.S.C. § 3403(a).  See 2d Am. Compl. ¶¶ 113-15.

As noted, the defendants responded with a motion to dismiss pursuant to Federal Rules of Civil Procedure 12(b)(1) for lack of standing and, alternatively, 12(b)(6) for failure to state a claim. As to the first position, the defendants argue that the alleged injury is too abstract to confer standing. As to the second position, the defendants argue a fatal lack of support for the plaintiffs' claims. However, because the Court agrees with the defendants that the plaintiffs' Second Amended Complaint fails to plead an injury in fact, this Memorandum Opinion addresses only the 12(b)(1) arguments.

## II.  STANDARD OF REVIEW

A motion to dismiss under Federal Rule of Civil Procedure 12(b)(1) presents "a threshold challenge to the court's jurisdiction." Morrow v. United States, 723 F. Supp. 2d 71, 75 (D.D.C. 2010) (quoting Haase v. Sessions, 835 F.2d 902, 906 (D.C. Cir. 1987)). The plaintiff bears the burden of establishing by a preponderance of the evidence that the court has subject matter jurisdiction. Lujan v. Defenders of Wildlife, 504 U.S. 555, 561 (1992). Accordingly, "the [p]laintiff's factual allegations in the complaint . . . will bear closer scrutiny in resolving [the motion]," Grand Lodge of Fraternal Order of Police v. Ashcroft, 185 F. Supp. 2d 9, 13-14 (D.D.C. 2001), and "the court need not limit itself to the allegations of the complaint," id. at 14. Instead, "a court may consider such materials outside the pleadings as it deems appropriate to resolve the question [of] whether it has jurisdiction [in] the case." Scolaro v. D.C. Bd. of Elections & Ethics, 104 F. Supp. 2d 18, 22 (D.D.C. 2000).

## III.  LEGAL ANALYSIS

The defendants argue that the Court lacks subject matter jurisdiction because the plaintiffs have not demonstrated their standing to bring the claims currently before the Court. And because a standing challenge presents a challenge to the Court's jurisdiction, the Court must

address these arguments first.  See Haase, 835 F.2d at 906 ("[T]he defect of standing is a defect in subject matter jurisdiction.").

The "irreducible constitutional minimum of standing," Lujan, 504 U.S. at 560, requires that three elements be satisfied:

> First, the plaintiff must have suffered an injury in fact—an invasion of a legally protected interest which is (a) concrete and particularized, [and] (b) actual or imminent, not conjectural or hypothetical. Second, there must be a causal connection between the injury and the conduct complained of—the injury has to be fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court. Third, it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.

Id. at 560-61 (internal quotation marks, citations, and alterations omitted).  While Congress may "enact statutes creating legal rights, the invasion of which creates standing, even though no injury would exist without the statute," Linda R.S. v. Richard D., 410 U.S. 614, 617 n.3 (1973); see also Warth v. Seldin, 422 U.S. 490, 501 (1975) ("Congress may grant an express right of action to persons who otherwise would be barred by prudential standing rules."), the "plaintiff still must allege a distinct and palpable injury to himself, even if it is an injury shared by a large class of other possible litigants," Warth, 422 U.S. at 501 (emphasis added).  Finally, "[i]n ruling on a motion to dismiss for lack of standing, the 'reviewing courts must accept as true all material allegations of the complaint in favor of the complaining party." Int'l Labor Rights Educ. & Research Fund v. Bush, 954 F.2d 745, 755 (D.C. Cir. 1992) (quoting Warth, 422 U.S. at 501).

Here, the defendants' principal contention is that the plaintiffs have suffered no legally cognizable injury.  See Defs.' Mem. at 7, 10, 13-14; Defs.' Reply at 4-5.  And although the plaintiffs are correct that "[i]t is well settled that a statute itself may create a legal right, the invasion of which causes an injury sufficient to create standing," and that "[p]laintiffs have standing if they have alleged facts sufficient to support a reasonable inference that the statute

5

was violated," Pls.' Opp'n at 22 (quoting Beam v. Mukasey, No. 07-C-1227, 2008 WL 4614324, at *6 (N.D. Ill. Oct. 15, 2008)), "the 'injury in fact' test requires . . . that the party seeking review be himself among the injured," Sierra Club v. Morton, 405 U.S. 727, 734-35 (1972). Accordingly, as the parties concede that the plaintiffs' complaint is limited solely to statutory violations of the RFPA, see Pls.' Opp'n at 20; Defs.' Reply at 4, the Court need only assess whether the plaintiffs have adequately pleaded an injury under the RFPA.

Citing cases from the United States District Courts for the Southern District of New York and the Eastern District of Virginia, the defendants argue that "[m]ultiple courts have rejected RFPA claims for lack of standing where plaintiffs—as Plaintiffs do here—offer nothing more than subjective speculation that the Government obtained their financial information." Defs.' Mem. at 13.  The Court agrees that the reasoning and analysis of these cases illuminate the standing issue currently before the Court.

First, in Walker v. S.W.I.F.T. SCRL, 517 F. Supp. 2d 801 (E.D. Va. 2007), the plaintiffs brought a suit against the Society for Worldwide Interbank Financial Telecommunication ("SWIFT"), an international consortium of banks, brokers, and investment managers.  Id. at 804. The plaintiffs, a resident of the District of Columbia and a resident of Illinois, sued on behalf of themselves and a putative class for, among other claims, a violation of the RFPA.  Id. at 804-05. The Walker plaintiffs claimed that in response to the September 11, 2001 terrorist attacks, the SWIFT unlawfully "disclos[ed]…[the plaintiffs'] financial data to the U.S. government." Id. at 805.  The defendants filed a motion to dismiss under Rule 12(b)(1) for lack of standing, arguing that the plaintiffs had attempted to establish that their financial information had been obtained by the government entirely on the basis of information reported in a New York Times article.  Id. at

804-805. After concluding that "the complaint fail[ed] to allege facts from which injury in fact [could] be inferred," id. at 808, the court granted the motion and dismissed the action, id. at 809.

Next, in Amidax Trading Grp. v. S.W.I.F.T , 607 F. Supp. 2d 500 (S.D.N.Y. 2009), Amidax Trading Group, for itself and on behalf of a putative class of all others similarly situated, brought, among other claims, a claim for a violation of the RFPA against the SWIFT, which was responsible for "rout[ing] about $6 trillion daily between banks, brokerages, stock exchanges and other institutions." Id. at 502.  Amidax alleged that, in the wake of the September 11, 2011 terrorist attacks, "the executive branch initiated a program to gain access to financial records of people suspected of having ties to terrorism." Id.  This program was, according to Amidax, "[r]un out of the CIA and overseen by the Treasury Department." Id.  The program allegedly authorized Treasury to "use administrative subpoenas to obtain records from [the] SWIFT without requiring a court-approved warrant or subpoena"—a violation of the RFPA. Id. According to Amidax, "[a]fter obtaining the information requested by the subpoenas, government officials were able to conduct certain targeted searches through the data." Id.  The defendants moved to dismiss the case under Federal Rule of Civil Procedure 12(b)(1) for lack of standing, arguing that the plaintiff had failed to show injury. Id.  The plaintiff's asserted injury was based on its belief that its financial records, which it believed to be held by the SWIFT, had been given to the Treasury because, at a press conference, the Secretary of the Treasury stated that the SWIFT told the Treasury that it would give the Treasury all the data that it had. Id. at 506.  Further, a New York Times article quoted an "unnamed person close to the operation" as stating that the government "got everything—the entire SWIFT database." Id.

Although there was some doubt as to whether the plaintiffs financial records were actually even contained in the SWIFT's database, the Amidax court assumed, for the purposes of

7

the 12(b)(1) motion, that they were.  Id.  Nonetheless, the court concluded that the "[p]laintiff's complaint [had] not allege[d] a concrete and particularized injury." Id. at 508.  The court held that the plaintiff's complaint was "premised upon conjecture" and "[i]t would be purely 'hypothetical' to surmise that plaintiff's financial information was among the tens of thousands (or perhaps hundreds of thousands) of . . . transactions obtained or reviewed by the government." Id.  In short, the court determined that the plaintiff's complaint, which it called a "patchwork of guesses and contradictions," had "failed to adequately allege an injury in fact." Id.

Here, the plaintiffs' arguments as to the legislative history and language of the RFPA notwithstanding, it is clear that they have not adequately pleaded a concrete and particularized injury, free of conjecture or speculation.  In pertinent part, through a subsection entitled "release of records by financial institutions prohibited," the RFPA provides that "[n]o financial institution, or officer, employees, or agent of a financial institution, may provide to any Government authority access to or copies of, or the information contained in, the financial records of any customer except in accordance with the provisions of this chapter." 12 U.S.C. § 3403(a) (emphases added).  The plaintiffs' Second Amended Complaint alleges that

> Plaintiff Stein has, on at least one occasion, called Bank of America using a domestic toll-free number and been connected to a person Mr. Stein believes was a foreign national residing overseas. During the contact with this Bank of America representative, Mr. Stein's financial records were accessed by the Bank of America representative whom Mr. Stein now believes was a foreign national residing overseas. Mr. Stein suspects that there might have been other instances wherein he contacted Bank of America, was connected directly to a foreign national residing overseas, that foreign national accessed Mr. Stein's financial records, yet Mr. Stein was not aware that the counterpart to his communications was a foreign national residing overseas.
>
> Plaintiff Ramson has, on at least one occasion, called Bank of America using a domestic toll-free number and been connected to a person Mr. Ramson believes was a foreign national residing overseas. During the contact with this Bank of America representative, Mr. Ramson's financial records were accessed by the Bank of America representative whom Mr. Ramson now believes was a foreign

8

>national residing overseas. Mr. Ramson <u>suspects</u> that there <u>might have been</u> other instances wherein he contacted Bank of America, was connected directly to a foreign national residing overseas, that foreign national accessed Mr. Ramson's financial records, yet Mr. Ramson was not aware that the counterpart to his communications was a foreign national residing overseas.
>
>Plaintiffs allege that there have been millions of instances wherein Bank of America customers have contacted Bank of America to obtain customer service and been connected to foreign nationals residing overseas. Plaintiffs <u>believe</u> that the transmission of their financial records to foreign nationals residing overseas incident to such foreign nationals providing financial services to Plaintiffs, caused U.S. Government authorities to gain access to Plaintiffs' financial record, access that U.S. Government authorities would not have if such financial records were husbanded within the United States.
>
>. . .
>
>Plaintiffs allege that Defendants, by transmitting financial records to overseas locales where U.S. authorities can act . . . without the constraint of U.S. law or the United States Constitution, are providing U.S. Government authorities with access to financial records that such authorities would not have were Plaintiffs' financial records husbanded within the United States.

2d Am. Compl. ¶¶ 96-100, 106 (emphases added).  As an initial matter, the Second Amended Complaint contains no details regarding how the plaintiffs were able to assess the nationality of the Bank of America representative answering their calls.  <u>See</u> Defs.' Mem. at 2 n.1.  The irony of the plaintiffs'—two individuals seemingly quite concerned with the protection of individual liberties from unwarranted invasion—"belie[fs]," which were apparently derived from no more than sound of voice, as to the nationality of the Bank of America representatives is not lost on the Court.  Second, the above-quoted passages of the Second Amended Complaint fail to show that the defendants have "released" or "provided" the government with "access to" or "copies of" the financial records of Bank of America customers.  More important to the injury in fact test, however, is the utter failure of the Second Amended Complaint to offer any facts upon which this Court could conclude that Bank of America, in violation of the RFPA, released the financial records of plaintiffs Stein and Ransom.  <u>See</u> <u>Amidax</u>, 607 F. Supp. 2d at 506 ("On their face, it is

9

doubtful that these two speculative and conjectural assertions could suffice to establish that the government obtained Amidax's financial information from [the] SWIFT."); Walker, 517 F. Supp. 2d at 808 ("[There is no] information indicating that plaintiffs' financial information was disclosed by [the] SWIFT. Plaintiffs rely on their own belief that their financial information has been disclosed, but such a belief, without more, cannot support standing.") (emphases added). The plaintiffs' allegations are literally rooted in belief and suspicion, as these two words appear frequently in the Second Amended Complaint. And belief and suspicion are quite far from the "concrete and particularized," and "actual or imminent, not 'conjectural' or 'hypothetical'" requirements of standing set forth in Lujan. 504 U.S. at 560. Accordingly, the plaintiffs have failed to establish an injury under the RFPA and, as such, have failed to demonstrate their standing to bring suit.[2]

### IV.  CONCLUSION

Because the plaintiffs have failed to plead facts evincing a violation of the RFPA as to their own financial records, the Court concludes that the defendants' Rule 12(b)(1) motion must be granted and does not reach the other grounds for dismissal asserted by Bank of America.[3]

                                        **REGGIE B. WALTON**
                                        United States District Judge

---

[2]  Having concluded that the plaintiffs have failed to meet the first of the three standing requirements, the Court need not assess the causation and redressability requirements.

[3]  The Court will contemporaneously issue an Order consistent with this Memorandum Opinion.